# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MIRIAM SAMUEL, ET AL.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 06-7234** |
| **UNITED HEALTH SERVICES** | * | **SECTION "L" (4)** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER & REASONS

Currently pending before this Court in this case is Plaintiffs' Motion to Certify Class (Rec. Doc. 133).  Additionally, a similar motion is before the Court in *Ronald Rivers, et al. v. Chalmette Medical Center, Inc., et al.*, Case No. 06-8519, Rec. Doc. 134.[1]  Pursuant to a Case Management Order for Class Certification Issues, the Court scheduled a joint class certification hearing in both cases for April 9, 2010.  Prior to the hearing, the parties agreed to submit the matter to the Court via briefs, stipulations, affidavits, and depositions.  On April 9, 2010, the Court received evidence and heard oral argument on the issue.  After considering the parties' briefing and arguments, as well as the stipulations, affidavits, and other exhibits admitted into evidence, IT IS ORDERED that the Plaintiffs' Motion to Certify Class IS DENIED. The proposed class definition cannot satisfy the requirements of typicality, predominance, and superiority set forth in Rule 23 of the Federal Rules of Civil Procedure.

## I.        BACKGROUND

The present case arises from the injuries and/or deaths of patients at Pendleton Memorial Methodist Hospital ("Methodist"), in New Orleans, Louisiana, following Hurricane Katrina in

---

[1] These two cases involve nearly identical allegations, arising out of similar circumstances, at two different local healthcare facilities in the aftermath of Hurricane Katrina.  Although the cases have not been consolidated, there is

late August and early September of 2005.[2]  On August 28, 2006, various patients and relatives of

deceased patients ("Plaintiffs") filed this putative class action against Pendleton Methodist

Hospital, LLC, United Health Services, Inc., UHS, Inc., UHS-Lakeland Medical Center, LLC,

UHS-Pendleton, Inc., UHS of River Parishes, Inc., and UHS of Delaware, Inc. (collectively,

"Defendants"), in the Civil District Court for the Parish of Orleans, Louisiana.  In their amended

petition, the Plaintiffs bring claims against Defendants, asserting various allegations of

negligence, intentional misconduct, and premises liability resulting in "unreasonably dangerous

conditions/defects in and/or on the premises of UHS in the wake of Hurricane Katrina,

particularly within the confines of the hospital buildings owned by UHS at 5620 Read

Boulevard, New Orleans, Louisiana (Pendleton) and 6000 Bullard Avenue, New Orleans,

Louisiana (Lakeland)."  Class Action Petition for Damages at ¶ II, Exhibit 1 to Rec. Doc. 1 (Oct.

3, 2006).  The basic facts underlying these allegations are as follows.

　　　　When it became apparent that Hurricane Katrina was going to hit New Orleans, many

local hospitals were faced with difficult decisions regarding whether to evacuate patients or to

"shelter in place."  On August 28, 2005, the day before Katrina's landfall, the City of New

Orleans issued a mandatory evacuation order which exempted hospitals, their personnel, and

their patients.  On the same day, Methodist continued to admit patients to the emergency

department of the acute care campus.  Additionally, both the acute care campus and the Lakeland

campus accepted patients who had been evacuated from Chalmette Medical Center including six

intensive care patients, eleven medical/surgical patients, and an unknown number of skilled

nursing and rehabilitation patients.  These patients were accompanied by nursing staff.  Although

---

significant overlap between the lawyers involved in the two cases.  Additionally, the proposed class definitions are
nearly identical and the briefs in the two cases are substantially similar.
[2] At the time of Hurricane Katrina, Methodist included the main acute care campus, which consisted of two
buildings - the main building and the East Tower - as well as a psychiatric, rehabilitation and skilled nursing facility

some patients may have been discharged and/or evacuated in anticipation of the approaching storm, Methodist did not attempt an evacuation prior to the storm.

As is now well documented, Hurricane Katrina made landfall on the Gulf Coast during the early morning hours of August 29, 2005. By 5:00 a.m., Methodist had lost its normal power supply and was relying on backup generators to provide power to the facility. There were three backup generators in place at Methodist at the time of the storm – one that provided power to the Lakeland campus, one that provided power to the East Tower wing of the acute care campus, and one that provided power to the main building of the acute care campus. At approximately 10:30 a.m., rising flood waters began to engulf the Methodist facility and the generator in the main building of the acute care campus was disabled. The generator in the East Tower was disabled from approximately 9:30 p.m. on August 28 until approximately 10:30 p.m. on August 29. The Lakeland campus generator did not function at any time following the loss of normal power. The air conditioning system was not connected to Methodist's backup generators, but the ventilation system was.

As the water continued to rise and the generators failed, conditions began to deteriorate to the point where persons at the facility: (a) no longer had running water; (b) did not have a fully functioning sewer system; (c) experienced elevated temperatures; and (d) experienced other conditions that the Plaintiffs allege were unreasonably dangerous. On August 30, 2005, a wholesale evacuation of the premises began. The evacuation was completed on September 2, 2005.

Plaintiffs' allegations are based solely on Defendants' conduct prior to the storm. Plaintiffs allege that they sustained injuries as a result of Defendants' failure to evacuate, failure

---

known as "Lakeland Medical Pavilion, a campus of Methodist Hospital" ("Lakeland"), which was located 1.8 miles away from the acute care campus.

to have a sufficiently designed and maintained emergency power system to provide electricity and air conditioning, and/or failure to have an adequate plan of care for patients and visitors in the event of a power outage. The Plaintiffs filed this lawsuit in state court in Orleans Parish as a class action and sought certification of a class composed as follows:

> All persons who sustained injury and/or damage, including but not limited to, personal injury or wrongful death, as a result of unreasonably dangerous conditions and/or defects in and/or on the premises of UHS on or about August 29, 2005, and/or as a result of the failure of UHS to attain, maintain, and/or provide an adequate means of transportation to timely and/or safely move persons off its premises in the wake of Hurricane Katrina.

*Id.* at ¶ III. In their briefing and at oral argument, Plaintiffs recognized that this class definition was overly broad and suggested that the Court consider a class definition that includes only those individuals who were at the hospital on the morning of August 29, 2005, when Hurricane Katrina hit, excluding employees of the Defendants.[3]

The parties have stipulated that approximately 666 individuals, excluding refugees and employees of Defendant, were at Methodist when Katrina struck. This number includes, but is not limited to, the following: (1) approximately 164 patients; (2) 14 staff physicians who were not employees of Defendants; (3) approximately 225 employees of Pendleton Methodist Hospital, LLC; (4) approximately 41 nurses and staff from Chalmette Medical Center, Inc. who were not employees of Pendleton Methodist Hospital, LLC; (5) approximately 32 employees of McKesson Corporation, an independent contractor providing pharmacy services; (6) four police officers; and (7) 3 national gaurdsmen. In addition, family members of patients and employees and certain other individuals from the community came to the hospital in search of shelter after the storm.

---

[3] At oral argument, the Defendants indicated their opposition to amending the class definition at this stage of the proceedings. The Defendants also recognized the Court's discretion when defining the class. Because neither the

On October 3, 2006, the Defendants timely filed a Notice of Removal. On November 2, 2006, the Plaintiffs filed a motion to remand. The Court, satisfied that it has jurisdiction over this case pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub.L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), denied the Plaintiffs' motion and issued a Case Management Order for Class Certification Issues. Now fully apprised of the legal and factual issues involved, the Court is ready to issue its ruling.

## II. LAW & ANALYSIS

### A. Standard of Review

The proponents of the class bear the burden of demonstrating that the case is appropriate for class treatment. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 n.4 (5th Cir. 2001). Class certification is soundly within the district court's discretion, and this decision is essentially a factual inquiry. *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502-03 (5th Cir. 2004). The class certification decision generally should not reach the merits of the plaintiffs' claims. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996). However, in some cases it is necessary for a district court to go beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make a meaningful certification decision. *Id.* The district court must make specific findings regarding how the case satisfies or fails to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure. *Vizena*, 360 F.3d at 503. Using these standards as a guide, the Court will now analyze the requirements for class certification.

original class definition nor the amended definition satisfies the requirements of Rule 23, in this Order & Reasons the Court will give the Plaintiffs the benefit of the doubt and consider the class definition as amended.

## B. Class Certification

Plaintiffs seek certification of their claims as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Rule 23 provides in relevant part:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ....
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Thus, read in combination, Rule 23(a) and 23(b)(3) provide six requirements which must be met for a group of claims to be certified as a class action – numerosity, commonality, typicality, adequacy, predominance, and superiority.

Rule 23 also provides for certain housekeeping procedures, such as bifurcation and subclassing, when appropriate for the management of common issues within a class action. The Plaintiffs have suggested that it may be useful to bifurcate this case and to try liability, causation and damages separately. Additionally, while Plaintiffs do not believe it is necessary to create subclasses in this case, they discussed the possibility at oral argument and indicated that creating a "patient subclass" may be useful during the causation and damages phases of the action. Prior to oral argument, the parties did not focus on the necessity or the practicality of these mechanisms. The Court notes Defendants' objection to consideration of subclasses at this stage

of the proceedings. However, even if the Court were to bifurcate or subclass the proposed class, this case would meet insurmountable hurdles in its journey to satisfy the requirements of Rule 23. In the interests of efficiency, and in an effort to minimize any repetitive discussion, the Court will discuss these requirements in the following order: numerosity, commonality, predominance, typicality, adequacy, and superiority.

**1. Numerosity – Rule 23(a)(1)**

To demonstrate numerosity, Plaintiffs must establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000). While the number of members in a proposed class is not determinative of this inquiry, the Fifth Circuit has cited with approval Professor Newberg's treatise which "suggest[s] that any class consisting of more than forty member 'should raise a presumption that joinder is impracticable.'" *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

In this case, even if refugees and employees of the Defendants are excluded, the proposed class consists of at least 441 individuals. This number includes patients, staff physicians, nurses from Chalmette Medical Center, employees of McKesson Corporation, national guardsmen and police officers. If this number was divided into subclasses, the patient subclass would contain approximately 164 persons and the other general subclass would contain at least 277 persons. Either way, the number in the class, and in each subclass, far exceeds the forty member presumptive threshold. Therefore, Plaintiffs are entitled to a presumption in their favor regarding the numerosity issue. Defendants have not offered any evidence to defeat this presumption.

## 2. Commonality – Rule 23(a)(2)

Rule 23(a)(2) requires that there be issues of law or fact common to the class. The commonality requirement is satisfied if at least one issue's resolution will affect all or a significant number of class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001); *Mullen*, 186 F.3d at 625. There is a low threshold for commonality, and the fact that some plaintiffs have different claims or require individualized analysis does not defeat commonality. *James*, 254 F.3d at 570.

Defendants argue that no common issues of fact exist in this case. They take the position that because significant differences exist between each of the individuals at Methodist during Katrina, there can be no common issues. For instance, the circumstances surrounding the arrival at Methodist vary greatly for each person. Some arrived days or weeks prior to Katrina, while others arrived only hours or minutes before the storm. Some went to Methodist out of necessity, while others chose to be there with family, or for shelter. These decisions implicate comparative fault issues that are unique to each person. Similarly, Defendants argue that the decision to evacuate was not an all-or-nothing decision but instead involved highly individualized decisions based on the medical condition of different individuals. Additionally, Defendants point out that different duties were owed to different Plaintiffs based upon their status at the hospital. With respect to causation and to damages, the Defendants claim that the conditions in the hospital had dramatically different effects on each person in the hospital based upon their specific circumstances.

While the arguments raised by Defendants are significant, they are more relevant to the predominance inquiry. Commonality, unlike predominance, is a very low threshold and can be met if the resolution of only one or more issues will affect a significant number of class

members. In this case, Plaintiffs have artfully drafted their allegations to focus on certain common decisions made prior to the hurricane, such as the Defendants' decisions regarding the design and maintenance of the emergency power system. These decisions certainly would have affected all of those persons on the Methodist premises. Similarly, certain conditions that were present in the hospital following the storm, such as heat, lack of plumbing and lack of electricity, were undoubtedly experienced by all class members. Clearly, a determination of what decisions were made before the storm and of what conditions were present in the hospital after the storm would be beneficial to all class members, and therefore commonality is satisfied.[4]

### 3. Predominance – Rule 23(b)(3)

Rule 23(b)(3) requires that the class share common issues of law or fact that predominate over the questions affecting individual class members. In general, in order to predominate, common issues must form a significant part of individual cases. *Mullen*, 186 F.3d at 626. Specifically, a district court should consider how the cases would proceed to trial, that is, whether any cases would require individual trials on particular issues. *See Castano,* 84 F.3d at 744-45 (finding that certification was inappropriate where individual trials would be necessary to determine an element of the plaintiffs' fraud claims).

While the predominance requirement is similar to the commonality element of Rule 23, the predominance standard is much "more rigorous." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006). When conducting the predominance analysis, the Court must examine each plaintiff's claims individually in order to determine how these claims would be tried. Even if the Court bifurcates a case, the Court should not look at whether common issues predominate over each phase of the trial, but at whether common issues predominate over the

---

[4] Of course, the Court recognizes that how these common decisions and conditions affected different people is extremely individualized. Additionally, the legal question of whether these common decisions constitute a breach of

case, as a whole. *Castano*, 84 F.3d at 745 n.21. Furthermore, "where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the [dissimilar] damages issue may predominate over any issues shared by the class." *Exxon*, 461 F.3d at 601.

In *Exxon,* an oil leak at Defendant's chemical plant ignited, sending a toxic smoke plume into the air which allegedly caused varying types and levels of personal injury and emotional distress to the members of the proposed class. *Id.* at 600. The Fifth Circuit affirmed the district court's denial of certification, reasoning that individualized causation and damages issues predominated over any common issues. *Id.* The Court reached this conclusion even in light of the fact that the Defendant essentially conceded that the liability analysis was common to the entire class. *Id.*

In the present case there are similarly individualized questions of causation and damages. In addition the Defendants dispute Plaintiffs' contention that the liability issues are common to all members of the class. Defendants assert that common issues do not even predominate over the liability portion of this case, let alone the case as a whole. Turning now to the legal grounds for Plaintiffs' claims, which are all based on Louisiana state law, the Court finds that any common issues of law or fact that exist in this case do not predominate over the multitude of questions affecting individual class members.

### i.    Negligence

Plaintiffs' petition alleges that Defendants were negligent in the following respects: (1) failing to plan for and provide adequate transportation, and/or an adequate evacuation plan, to enable persons located on the premises to evacuate; (2) failing to provide and maintain a backup power supply capable of withstanding the Hurricane; (3) failing to prevent unreasonably dangerous conditions at Methodist in the wake of the storm; and (4) failing to warn individuals

duty owed to different plaintiffs may be uncommon as well.

of the unreasonably dangerous conditions present at Methodist. Importantly, Plaintiffs focus these allegations on the conduct of the Defendants in advance of the storm, and not on the actual conditions that were present at the facility following the storm which may have resulted, in part or in whole, from the prior decisions.

In Louisiana, courts employ a duty-risk analysis to determine the potential negligence of a defendant. *Long v. State Dep't of Trans. & Dev.*, 916 So.2d 87, 101 (La. 2005). Generally, this analysis involves five separate elements: 1) proof that the defendant had a duty to conform its conduct to a specific standard (the duty element); 2) proof that the defendant's conduct failed to conform to that standard (the breach element); 3) proof that the defendant's conduct was cause-in-fact of plaintiff's injuries (the cause-in-fact element); 4) proof that the defendant's conduct was legal cause of plaintiff's injuries (the scope of liability element); and 5) proof of actual damages (the damages element). *Id.*

### a. Duty

In this case, Plaintiffs' argument that common issues predominate over individualized inquiries begins with the proposition that the Defendants owed a common, baseline duty to all persons on the premises at the time of the storm, regardless of whether that person was a patient or was at Methodist for some other reason. While this may be true, Plaintiffs' argument fails to account for the fact that the duty a hospital owes to its patient is unique. *Hunt v. Bogalusa Cmty. Med. Ctr.*, 303 So. 2d 745, 747 (La. 1974). As the Supreme Court of Louisiana has explained:

> A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.

*Id.* Thus, the duty owed to a patient clearly varies in each case depending on the specific needs of that patient. Even ignoring the differences between patients and the other proposed class members, significant individual issues exist with respect to duty, even within the proposed patient subclass.

Although it has not been fully fleshed out in the briefing, it seems that Plaintiffs' proposal would require the Court to conduct one joint trial regarding the baseline duty owed to all. Initially, the Court notes that even this trial would likely be impractical, if not impossible. The proposed class representatives, Miriam Samuel and those pursuing the claim of Lawrence Tassain, are bringing claims on behalf of individuals who were patients at Methodist. It is unclear to the Court how it could instruct a jury to disregard the fact that Miriam Samuel and Lawrence Tassain were patients and to determine whether the Defendants owed them some lesser baseline duty. Any instruction that the Court could formulate would require the jury to speculate about what duty would have been owed to all non-patients or what duty would have been owed to Miriam Samuel and Lawrence Tassain had they not been patients. This inquiry would be so divorced and disconnected from the actual duty analysis that it would not actually add anything to the proceedings.

Following this joint trial to establish a baseline duty, the Court would have to conduct a large number of mini-trials just to determine exactly what heightened duty was owed to each patient. For example, the standard of care would vary greatly between a patient who was on a ventilator and one who was at Methodist for treatment of a broken arm. A patient on a ventilator would clearly suffer serious consequences if the emergency power supply were to fail, while the impact on a patient with a broken arm would be minimal. Thus, the hospital would likely owe the first patient a duty to have an adequate emergency power supply, while they might not owe

the same duty to an individual with a broken arm. In fact, the duty owed to the hypothetical individual with a broken arm would likely be more akin to the duty owed to a non-patient. Similarly, the decisions made regarding the evacuation plan and whether or not to conduct an evacuation would involve individualized questions about whether a particular person would be able to shelter in place, whether they could survive an evacuation, and which option would be more traumatic for that individual. The duty to evacuate each patient would inevitably depend on the condition of that patient. Clearly, the necessary mini-trials would be complex. Common issues cannot be said to predominate, even over the duty element of the liability portion of this case.

### b. Breach

Whether or not a duty was breached necessarily depends upon what duty was owed. Perhaps the evacuation plan that the Defendants had in place was adequate for certain patients, such as our hypothetical patient with the broken arm, and inadequate for other patients, such as someone who required prescription medication that was in limited supply. Additionally, the breach inquiry would vary greatly depending upon which wing or building a particular plaintiff was in during the storm. Each backup generator was positioned differently, and had a different ability to withstand the Hurricane, as evidenced by the fact that each generator was rendered non-functional for a different period of time. Whether the Defendants breached a duty to a plaintiff would depend on the decisions that they made regarding the specific generator that was designed to provide power to the wing in which he or she was located. The Court therefore clearly could not resolve this issue on a universal basis, but would instead have to conduct individual trials for at least all of the members of the patient subclass.

### c. Causation

In addition to the aforementioned issues that would require treatment separate from the class proceedings, the causation element compounds the lack of predominance and further confirms that class treatment would be inappropriate in this case.  In some cases in which all of the injuries alleged by a proposed class are the result of a single incident, such as a refinery explosion, courts have found that common issues predominated.  *See e.g.*, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626-27 (5th Cir. 1999); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022-23 (5th Cir. 1992).  In *Mullen*, for example, the Court affirmed certification of a class of employees on a riverboat casino who all alleged that they had been injured by a defective ventilation system onboard.  *Mullen*, 186 F.3d at 620.  The alleged injuries were limited to certain breathing problems, such as asthma and bronchitis.  *Id.*  The Fifth Circuit, in reaching their decision, pointed out that "the putative class members are all symptomatic by definition and claim injury from the same defective ventilation system over the same general period of time."  *Id.* at 627.

In other cases, however, the Fifth Circuit has viewed causation, and medical causation in particular, as a significant barrier to a finding of predominance.  *See Exxon*, 461 F.3d at 603.  In *Exxon*, which also concerned a single incident – a smoke plume caused by an oil fire at a chemical plant – the Court recognized that different individuals would have been affected by the smoke plume in different ways.  As the Court explained:

> [T]he causal mechanism for plaintiff's injuries – alleged exposure or fear of
> exposure to toxic substances – is not so straightforward.  While it is certainly true
> that the cause of the fire itself is an issue common to the class, each individual
> plaintiff must meet his or her own burden of medical causation, which in turn will
> depend on any number of the factors enumerated by the experts who testified at
> the class certification hearing.

*Id.* Thus, it appears that where Plaintiffs allege a variety of injuries as opposed to injuries of a single type, such as the respiratory injuries alleged in *Mullen*, the individualized determinations necessary to prove causation will preclude a finding of predominance.

In this case, Plaintiffs have alleged a vast array of injuries. Some Plaintiffs have claims for wrongful death. Others have claims for personal injury only. Still others have claims for both personal injury and emotional distress. Additionally, many of the proposed class members were hospital patients and thus would have had significant pre-existing conditions that would further complicate the causation inquiry and medical causation in particular. Moreover, it is not entirely clear that this case represents a single incident case. Although Hurricane Katrina can be viewed as a single occurrence, the allegedly dangerous conditions at the hospital which resulted from the Defendant's alleged negligence were what actually caused the injuries to the members of the proposed class. These conditions varied from excess heat to lack of electricity to the absence of a functional sewer system. The conditions would have varied between the three Methodist buildings, especially since each building was connected to a separate backup power supply. Each plaintiff would have been affected by these conditions in a different way. Therefore, common issues cannot be said to predominate.

### d. Damages

Finally, the Court need not spend a great deal of time discussing the damages in this case. It is sufficient to recognize the varied nature of the damages claimed by different proposed plaintiffs. This is not a case like *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006), in which all plaintiffs' claims were limited to property damage. Clearly, the damages analysis for a wrongful death claimant will be significantly different than it would be for a plaintiff who asserts that he suffered from dizziness and dehydration. Thus, the damages

inquiry, like every other element of the Plaintiffs' negligence claims, is riddled with questions that are unique to each Plaintiff. Common questions cannot be said to predominate over any aspect of this claim, let alone the claim as a whole.

### e. Affirmative defenses

Predominance may also be defeated where affirmative defenses are asserted that would prevent a uniform liability analysis. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004); *In re Katrina Canal Breaches*, 258 F.R.D. 128, 136 (E.D. La. 2009). In *In re Katrina Canal Breaches*, Hurricane Katrina allegedly caused Defendant's barge to break free of its moorings and strike the canal wall, causing a breach, and eventual flooding. *Id.* at 130-31. Plaintiffs alleged that the flooding caused property damage, personal injury, and wrongful death to member of the proposed class. *Id.* The Court, in denying class certification, reasoned that "Defendants could raise defenses regarding the negligence of individual Plaintiffs in failing to remove certain valuables and evacuating prior to Hurricane Katrina . . . . The only possible means of [resolving these issues] would be through individualized hearings." *Id.* at 136. The Court concluded that these individualized issues of fault precluded certification. *Id.* at 136-37 ("[T]his Court finds it appropriate to consider affirmative defenses in this class certification analysis, and moreover finds that the real possibility of affirmative defenses being raised suggests that class certification is inappropriate.").

Similarly, in this case the Defendants assert that the negligence of certain Plaintiffs contributed to their injuries. Specifically, they argue that the circumstances surrounding the arrival of different members of the proposed class at Methodist will vary greatly. Some were checked in well in advance of the storm and could not leave for various reasons. Others arrived only shortly before the storm, knowing full well that Hurricane Katrina was bearing down on the

city. For some individuals, evacuation on their own may have been an option, while for others it was not. Like in *In re Katrina Canal Breaches*, the possibility of evacuation raises questions of comparative fault that will require individual resolution and which prevent predominance of any common issues.

### ii. Intentional Misconduct

On February 26, 2007, the Plaintiffs amended their complaint to include claims of intentional misconduct based on the allegations that the Defendants knew, or should have known, that their pre-storm decisions regarding evacuation, backup power, and air conditioning were substantially certain to cause harm to the Plaintiffs. Under Louisiana law, intentional tort claims, like negligence claims, are contemplated under the general concept of fault embodied in Civil Code article 2315. *Peters v. Allen Parish Sch. Bd.*, 996 So. 2d 1230, 1233 (La. App. 3 Cir. 2008). As the Supreme Court of Louisiana has explained, "[n]egligent torts and intentional torts are not different in kind, but rather are different in degree." *Veazey v. Elmwood Plantation Assocs., Ltd.*, 650 So. 2d 712, 729 (La. 1994) (Lemmon, J., dissenting). The analysis for an intentional tort claim, like the analysis of a negligence claim, must begin with a determination of whether the defendant owed a duty to the plaintiff. *Peters*, 996 So. 2d at 123. Thus, the Plaintiffs' claims for intentional misconduct will require much, if not all, of the same individualized analysis that would be necessary for their negligence claim.

In addition, to prove an intentional tort the Plaintiffs would have to show that the Defendants acted with intent. An action is intentional, under Louisiana law, if the actor "either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result." *Cole v. State Dep't of Public Safety*

*and Corrections*, 825 So. 2d 1134, 1140 (La. 2002) (quoting *Bazley v. Tortorich*, 397 So. 2d 475, 481 (La. 1981)).  In this case, the Plaintiffs' complaint alleges that the Defendants knew, or should have known that harm to Plaintiffs was substantially certain to follow from their conduct.  Although it may be true that Defendants knew or should have known that their decisions would lead to certain consequences in the event of a hurricane, their knowledge of what harm was likely to befall each Plaintiff would depend on the pre-existing condition of that Plaintiff and would require further individualized inquiries.  Accordingly, common issues do not predominate within Plaintiffs' intentional tort claims.

### iii.    Premises Liability

Until 1996, the Louisiana Civil Code imposed a form of strict liability upon the owners of things and buildings.  Article 2317 provides that, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."  In 1996, the Louisiana legislature enacted article 2317.1 which altered the strict liability landscape in Louisiana by injecting a fault element into the analysis of liability.  After this amendment, a plaintiff proceeding on a theory of premises liability under article 2317.1 must prove that: "(1) the thing which caused damages was in the control or custody of the defendant; (2) the thing had a defect that created an unreasonable risk of harm; (3) the injuries were caused by the defect; and (4) the defendant had actual or constructive knowledge of the defect."  *Nelson v. Louisiana Stadium and Exposition Dist.*, 832 So. 2d 1043, 1047 (La. App. 4 Cir. 2007).

Additionally, if a Plaintiff asserts a claim under article 2322, which applies to damage caused by the ruin of a building, he must prove that the ruin was "caused by neglect to repair it, or [was] the result of a vice or defect in its original construction."  La. Civ. Code. art. 2322.  The

Plaintiff would also have to prove that the Defendant "knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that [the Defendant] failed to exercise such reasonable care." *Id.*

Plaintiffs' allegations, as this Court reads them, focus on the actions of the Defendants prior to the storm. Thus, the dangerous conditions that may have been present after the storm are not the conditions that Plaintiffs complain of, nor are they the conditions upon which Plaintiffs' premises liability claims are based. Instead, Plaintiffs claims could be based only on the following acts, which are alleged to be unreasonably dangerous: (1) placement of the backup generators such that they would be vulnerable to rising floodwaters; and (2) the decision not to have an air conditioning system that could continue to operate once the primary power source was lost. Although the Court need not decide, at this stage of the proceedings, whether Methodist was in a state of ruin under article 2322, the Court does not view these conditions as the type that would constitute ruin under the statute. *See Olsen v. Shell Oil Co.*, 365 So. 2d 1285, 1288-89 (La. 1978) ("The owner's fault [under article 2322] is founded upon the breach of his obligation to maintain or repair his building so as to avoid the creation of undue risk of injury to others.")

In addition to the problems with predominance that doomed Plaintiffs' negligence claims, the Plaintiffs' premises liability claims would require a finding that the thing that caused the harm presented an unreasonable risk. In the context of a hospital, whether the risk of a particular harm is unreasonable would be highly case specific. Under Louisiana law, "[t]he determination . . . [of w]hether a particular risk is unreasonable is a difficult question, which requires a balance of the intended benefit of the thing with its potential for harm and the cost of prevention."

*Nelson*, 832 So. 2d at 1047. Courts look at the following four major factors when conducting this analysis: "(1) the utility of the complained of condition; (2) the likelihood and magnitude of harm"; "(3) the custodian's cost of preventing the harm; and (4) the nature of plaintiff's activity in terms of its social utility or whether it is dangerous by nature." *Id.*

Clearly, this balancing test would need to be done on a case-by-case basis for the individuals at Methodist prior to Katrina. While a determination of the cost of preventing the harm and the utility of maintaining the backup generators and air conditioning as they were would likely be common to the class, the likelihood of harm to each plaintiff that might result from a failure of the air conditioning or the backup power supply would be essential to determining whether the condition presented an unreasonable risk of harm. The likelihood of harm to a plaintiff with a broken arm would be much lower than would the likelihood of harm to a patient on a ventilator. Further, under the fourth factor, consideration of whether the Plaintiff was at the hospital for treatment or for shelter would likely come into play. These individualized inquiries simply add to the list of individualized issues that prevent a finding of predominance.

Furthermore, contrary to Plaintiffs' assertions at oral argument, comparative negligence will likely be an issue in the premises liability claims as well. Even prior to 1996, when premises liability was a form of strict liability, Louisiana courts allowed comparative negligence as a defense. *Delaune v. Med. Ctr. of Baton Rouge*, 683 So. 2d 859, 868 (La. App. 1 Cir. 1996) ("It is now judicially accepted that contributory negligence . . . is a defense in a strict liability case, as well as [in] a proceeding based on negligence.") Thus, the discussion of comparative negligence above is equally applicable to Plaintiffs' premises liability claims. Even when analyzing the potential liability of the Defendants under this cause of action it cannot be said that

common issues predominate.  That fact, coupled with the individualized nature of the causation and damages inquiries, again precludes a finding of predominance.

### 4.  Typicality – Rule 23(a)(3)

Rule 23(a)(3) requires that the claims of the class representatives are typical of the class's claims or defenses.  Again, the threshold for typicality is low:  class representatives must show similarity between their legal and remedial theories and the theories of the rest of the class. *Mullen*, 186 F.3d at 625.  Typicality does not require that the claims of the class are identical, but rather that they share the same essential characteristics – a similar course of conduct, or the same legal theory. *James*, 254 F.3d at 571 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000)).

Plaintiffs have named both Miriam Samuel and the representatives of Lawrence Tassain as class representatives. Miriam Samuel was a patient at the acute care center when Katrina hit. Lawrence Tassain was also a patient at the acute care center who passed away at some point. The parties apparently dispute whether Mr. Tassain expired while at Methodist or whether he was evacuated and passed away somewhere else.  Plaintiffs argue that these claims are typical of the claims of the class because they are based on the common facts surrounding Defendants' pre-storm decisions and because they assert claims based on theories of liability that are applicable to the class as a whole.  However, it is clear that the similarities end with these very general allegations.  As the Court has already discussed, hospitals owe a heightened duty to individual patients.  Clearly, Miriam Samuel and Lawrence Tassain, both patients, could at best only be typical of other patient class members.  Additionally, the duty owed to Miriam Samuel and to Lawrence Tassain would have depended largely on the specific medical needs that were unique to each Plaintiff and which would have been different for all other patients at Methodist.  The

circumstances surrounding the class representatives' arrival and departure from Methodist would also be highly individualized, as would proof of medical causation. Furthermore, the claim brought by Bernadette Tassain-Pitts on behalf of Lawrence Tassain is a wrongful death claim, which is certainly not typical of the claims of all putative class members. Accordingly, while each class representative may have a valid claim, they cannot be said to be typical of the claims of the class as a whole.

### 5. Adequacy – Rule 23(a)(4)

Rule 23(a)(4) demands that the named class representatives fairly and adequately represent the claims of the other class members. There can be differences between the position of class representatives and other class members so long as these differences do not "create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 626. A district court should evaluate whether the class representatives have a sufficient stake in the outcome of the litigation, and whether the class representatives have interests antagonistic to the unnamed class members. *Id.* (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1972)). In addition, the district court should inquire into the zeal and competence of the class representatives' counsel and into the class representatives' willingness to take an active role in the litigation and to protect the interests of absentees. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

The proposed class representatives in this case do not appear to have interests that would be counter to those of other plaintiffs in this matter. Plaintiffs have now sought to exclude the employees of the Defendants from the proposed class. Accordingly, it does not appear to the Court that there are any foreseeable conflicts that might arise between Miriam Samuel or Lawrence Tassain and other proposed class members. Rather, the interests of the class members

appear to be sufficiently aligned even though significant differences exist regarding the specifics of each Plaintiff's claim. Moreover, Miriam Samuel and Bernadette Tassain-Pitts have each executed an affidavit stating that they intend to vigorously prosecute their claims on behalf of the proposed class. In addition, counsel for the class representatives have all filed affidavits stating that they have the financial resources, experience, and desire to adequately represent the class. These affidavits satisfy the Court that counsel are committed to these cases and will litigate them zealously. The Court finds that the class representatives, Miriam Samuel and Bernadette Tassain-Pitts, could fairly and adequately represent a proposed class of plaintiffs in this matter under Rule 23(a)(4), if Plaintiffs were able to satisfy the remaining requirements of Rule 23.

### 6. Superiority – Rule 23(b)(3)

Under Rule 23(b)(3), a district court must evaluate four factors to determine whether the class action format is superior to other methods of adjudication: the class members' interest in individually controlling their separate actions, the extent and nature of existing litigation by class members concerning the same claims, the desirability of concentrating the litigation in the particular forum, and the likely difficulties in class management.[5] The Fifth Circuit has noted that there is an important relationship between the superiority analysis and the predominance analysis. *Exxon*, 461 F.3d at 604. Where common issues do not predominate, any effort to conduct a class action "would denigrate in practice into multiple lawsuits separately tried." *Id.* (quoting Fed. R. Civ. P. 23(b)(3) advisory committee's notes).

---

[5] The Fifth Circuit in *Castano* advised that a district court's superiority analysis should include consideration of the negative impact upon a defendant of certification of a mass tort. 84 F.3d at 746. The court noted that class certification magnifies unmeritorious claims, increases plaintiffs' damage awards, and creates "insurmountable pressure" upon defendants to settle - all of which could be tantamount to "judicial blackmail." *Id.* Also, the Fifth Circuit warned that "historically, class certification of mass torts has been disfavored." *Id.*

However, the U.S. Supreme Court has more recently held that mass tort cases can be certified under Rule 23. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) ("Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement .... [however, courts should exercise] caution when individual stakes are high and disparities among class members great.")

In this case, Plaintiffs argue that the class action is a superior format of adjudication because it will minimize the risk of non-uniformity of results and maximize judicial efficiency. However, as a practical matter, certifying a class action in a case with such substantial differences between proposed class members, even those within the patient subclass, would render the class action ineffective. As previously discussed, the need for resolution of individual issues would be present at every stage of the proceedings. So many issues, including even the most basic legal and factual questions regarding the asserted theories of liability and the affirmative defenses of contributory negligence, would require such separate treatment that judicial efficiency might actually suffer by utilizing a class action here. Accordingly, class management would be extremely burdensome. Furthermore, Plaintiffs certainly would have an interest in controlling their separate actions. While some may wish to focus on the Defendants' decision not to evacuate, others might focus their case on the lack of air conditioning in the hospital. Similarly, some Plaintiffs would be required to expend significant energy demonstrating that their own negligence did not contribute to their harm, while for others this conclusion might be facially obvious. Furthermore, the state court system is no stranger to cases of this sort, as they have dealt with similar cases brought by Plaintiffs at other hospitals. Accordingly, the interest in centralizing this litigation in this forum is not a factor in favor of certification. Finally, the number of cases involved here is not so great that it would cause a judicial crisis. For these reasons, the Court finds that the superiority requirement of Rule 23(b)(3) has not been met.

## III.    CONCLUSION

The Court recognizes that at least two similar class actions have been certified in state court. *See Husband v. Tenet Healthsystems Mem. Med. Ctr., Inc.* 16 So. 2d 1220 (La. App. 4

Cir. 2009); *Martin v. LaFon Nursing Facility of the Holy Family*, Case No. 06-6370 (Civ. Dist. Ct. Parish of Orleans, Oct. 12, 2009). However, these decisions are not binding on this Court. Instead, this Court is bound to follow relevant Fifth Circuit precedent on the issue of class certification, which has paved a difficult road for class certification of mass tort personal injury cases in this jurisdiction. In this case, as discussed above, this precedent requires that the Court reach a result that is inconsistent with the state court decisions.

For the foregoing reasons, IT IS ORDERED that Plaintiff's Motion to Certify Class (Rec. Doc. 133) IS DENIED.

New Orleans, Louisiana, this 4th day of June, 2010.

_____
UNITED STATES DISTRICT JUDGE